# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**K.J. BRUBAKER, A.Y. MARKS, A.C. RUGH**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**ARMANDO RAMIREZ**
**SERGEANT (E-5), U.S. MARINE CORPS**

**NMCCA 201500123**
**SPECIAL COURT-MARTIAL**

**Sentence Adjudged:** 15 January 2015.
**Military Judge:** LtCol C.M. Greer, USMC.
**Convening Authority:** Commanding General, Command Element, II Marine Expeditionary Force, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** Col G.W. Riggs, USMC.
**For Appellant:** LT Drew Austria, JAGC, USN; LT Jessica L. Ford, JAGC, USN.
**For Appellee:** LT James M. Belforti, JAGC, USN.

**24 September 2015**

---------------------------------------------------------
## OPINION OF THE COURT
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

PER CURIAM:

A special court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of one specification of attempted wrongful purchase of stolen property, one specification of conspiracy to commit larceny and one specification of conspiracy to wrongfully ship a firearm, an offense under 18 United States Code § 922, in violation of Articles

80 and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 881.[1]  Subsequently, the military judge conditionally dismissed the charge of attempted wrongful purchase of stolen property[2] and merged, as an unreasonable multiplication of charges, the two specifications of conspiracy.[3]  For the now sole offense of conspiracy, the members sentenced the appellant to reduction to pay grade E-1 and a bad-conduct discharge.  The convening authority (CA) approved the sentence as adjudged.

The appellant raises three assignments of error (AOE): (1) that after the CA failed to indicate in his action that he had ordered separate trial in four companion cases and the appellant's sentence was disproportionately severe to that of the companion cases; (2) his convictions were legally and factually insufficient;[4] and (3) the court-martial order (CMO) did not accurately reflect the proceedings of the court.

After carefully considering the record of trial and the submissions of the parties, we find merit in the appellant's second AOE asserting the evidence is legally insufficient to sustain his conviction for the portion of the merged conspiracy specification pertaining to larceny.  Additionally, we find merit in the appellant's third AOE asserting the CMO does not accurately reflect the proceedings.  However, we conclude the findings on the remaining portion of the merged conspiracy specification and the sentence are correct in law and fact and that following our corrective action no error materially prejudicial to the substantial rights of the appellant remains.   Arts. 59(a) and 66(c), UCMJ.

---

[1] For Specification 1 of Charge I, the court-martial found the appellant guilty by exceptions and substitutions, excepting the words "of a value greater than $500.00" and substituting the words "of a value of $500.00 or less".  For Charge II, the court-martial found the appellant not guilty of the charged offense of wrongful purchase of stolen property in violation of Article 134, UCMJ, but guilty of the lesser included offense of attempted purchase of stolen property.

[2] At the time of trial, the parties agreed that Charge II was a contingency of proof to Specification 1 of Charge I.  Record at 31.  The military judge conditionally dismissed Charge II after findings but before sentence based on that agreement.  *See United States v. Thomas*, 74 M.J. 563 (N.M.Ct.Crim.App. 2014) (discussing the wide discretion given military judges to dismiss, consolidate or merge offenses).

[3] The military judge merged conspiracy to commit larceny of a rifle upper receiver and conspiracy to ship the upper receiver to the United States into one consolidated specification.

[4] A section of AOE II is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

2

## Background

The appellant was the second of four Ramirez sons to join the Marine Corps and by accounts was an intelligent and hardworking Marine. He was an E-5, enlisted since 2007, who was a rifle marksman trained in weapons and warfighting. So it was no surprise that, while deployed to Afghanistan in June 2013, the appellant was dubious when then-Sergeant (Sgt) JH offered to sell him part of an M4 rifle.

Sgt JH and the appellant deployed to Camp Leatherneck, Helmand Province, Afghanistan in January 2013 and served in the same platoon. Sgt JH was assigned as the Chief Armorer, Second Marine Expeditionary Force Headquarters Group. In that capacity, Sgt JH had access to every weapon or weapon part located onboard Camp Leatherneck, including unaccounted-for gear stored on the "retrograde lot."[5]

Facing mounting financial trouble, Sgt JH decided to sell military weapons parts to fellow Marines, including M4 and M4-A1 rifle upper receivers.[6] The M4 rifle is a military firearm, and no personal firearms were permitted onboard Camp Leatherneck. Sgt JH chose the upper receiver because it was not serialized, making it harder for authorities to later identify the part.

Sometime between February and April 2013, he took enough parts from the retrograde lot to build seven or eight upper receivers, reassembling the parts in the armory compound on his own.

Sgt JH first approached the appellant about buying a stolen upper receiver in April 2013. At that time, Sgt JH offered to sell him an M4 rifle receiver for $400.00 or an M4-A1 rifle receiver for $500.00. The appellant was left unsure.

One week later Sgt JH again offered the receivers to the appellant. Always the salesman, Sgt JH offered to show the appellant a completed upper receiver the next day if that would help close the deal. The appellant agreed to meet.

---

[5] Redeployment and Retrograde in support of Reset and Reconstitution Operations Group was tasked with sorting, cleaning and preparing equipment for redeployment, and this equipment was stored on the retrograde lot. The unaccounted nature of the equipment stored on the retrograde lot is one reason Sgt JH chose this location from which to steal weapons parts.

[6] In general, the M4 rifle consisted of the upper receiver, the lower receiver and the bolt carrier group. In part the M4-A1 rifle upper receiver differed from the M4 in that it had a thicker barrel to support automatic weapons fire.

3

The next night, 1 May 2013, Sgt JH brought the sample upper receivers to the appellant's quarters. In a scene evocative of film noir, Sgt JH ushered the appellant and his roommate, Corporal (Cpl) JS, to his utility 4x4 "gator" and showed them the upper receivers concealed in a bag in the front seat. After re-camouflaging the receivers, Sgt JH, Cpl JS, and the appellant retired to the appellant's room to finalize a deal.

Sgt JH told the appellant and Cpl JS that he intended to secrete the receivers in an armory quadcon[7] destined for the United States. Once back in the States, Sgt JH would intercept the quadcon, gather the receivers, and then meet the buyers in an undisclosed location for turnover.

The appellant and Cpl JS quickly agreed and made payment, reflected in near simultaneous online bank transfers of $400.00 and $500.00 to Sgt JH from the appellant and Cpl JS respectively. In order to avoid the potential loss of military weapons parts, agents from the Naval Criminal Investigative Service (NCIS) intervened before the actual transport of any weapons parts. As a result, the appellant never received his M4 rifle upper receiver.

When confronted by NCIS investigators, the appellant stated, "I messed up,"[8] an avowal reflective of prescient remarks he made earlier to Cpl JS that the arrangement, "wasn't a good idea, this was stupid . . . [we're] going to end up getting caught."[9]

Additional facts necessary for the resolution of the particular assignments of error are included below.

### Legal and Factual Sufficiency

We review issues of legal and factual sufficiency *de novo*. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007).

We review the legal sufficiency of the evidence by determining "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). The test for factual sufficiency is whether "after weighing all the evidence in the

---

[7] A steel container used for storage and shipping.

[8] Record at 141.

[9] *Id*. at 162.

4

record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007) (citations omitted).

Here the appellant asserts the conviction for conspiracy to commit larceny was legally insufficient because the conspiracy arose after Sgt JH stole the rifle upper receiver. We agree.

To convict an accused of conspiracy, the prosecution must prove that:

> (1) The accused entered into an agreement with one or more persons to commit an offense under the code; and

> (2) While the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 5b. The MCM elaborates:

> Two or more persons are required in order to have a conspiracy. . . . A person may be guilty of conspiracy although incapable of committing the intended offense. . . . However, [a] conspirator who join[s] an existing conspiracy can be convicted of [the] offense only if, at or after the time of joining the conspiracy, an overt act in furtherance of the object of the agreement is committed. . . . The overt act must be independent of the agreement to commit the offense; must take place at the time of or after the agreement; must be done by one or more of the conspirators, . . . and must be done to effectuate the object of the agreement.

Part IV, ¶ 5c. While the overt act itself does not need to be criminal, the act must be in furtherance of the agreed upon criminal offense.

No amount of overt action can further the criminal offense if the criminal offense has already been completed. Therefore, it is significant in this case to determine whether the larceny that was the object of this conspiracy was complete or was still ongoing.

Under Article 121 of the Uniform Code of Military Justice, the elements for the offense of larceny are:

(1) That the accused wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person;

(2) That the property belonged to a certain person;

(3) That the property was of a certain value, or of some value; and,

(4) That the taking, obtaining, or withholding by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any other person other than the owner.

MCM, Part IV, ¶ 46b.

A larceny may be accomplished as a "taking," as an "obtaining," or as a "withholding," and which flavor of larceny alleged will affect when the larceny begins and ends.[10] From the record, it is clear that the parties believed this case involved the "taking" form of larceny. Importantly, the military judge's instructions on findings included as an element that, "the accused wrongfully took" the rifle upper receiver from the United States government.[11] The military judge then defined "taking" without similar reference to "withholding" or "obtaining."[12] The Government concedes as much in its brief, clearly referring to the larceny as a "taking."[13]

---

[10] Of note the analysis differs when the parties pursue a "withholding" theory of larceny. A withholding may arise as a result of a failure to return or account for property to its owner when an accounting is due, or it may arise as a result of devoting property to a use not authorized by its owner. This is so whether the withholder acquired the property lawfully or unlawfully. *United States v. Hubbard*, 28 M.J. 203, 205 (C.M.A. 1989). In this case given Sgt JH's custodial role as Chief Armorer over weapons parts, it may be argued that the larceny didn't begin until an accounting for the upper receivers was due. As the parties were clearly agreed on the form of larceny alleged in this case (i.e. a "taking"), it is not a matter we are tasked to decide here.

[11] Record at 202.

[12] *Id.*

[13] Government Brief of 15 Jul 2015 at 19.

6

As a general matter, courts have held the crime of larceny begins with the perpetrator's initial taking and continues "until such time as its fruits are secured in a place where they may be *appropriated to the use of the perpetrator of the scheme.*" *United States v. Dawson*, 50 M.J. 599, 601-02 (N.M.Ct.Crim.App. 1999) (citing *United States v. Seivers*, 8 M.J. 63, 65 (C.M.A. 1979)). The process of carrying away property is referred to as asportation, and the asportation end-point helps define whether a larceny is ongoing or complete.

> The crime of larceny obviously continues as long as the asportation continues and the original asportation continues at least so long as the perpetrator of the crime indicates by his actions that he is dissatisfied with the location of the stolen goods immediately after the crime *and with no more than a few minutes delay causes another to continue the asportation.*

*United States v. Hubbard* 28 M.J. 203, 205 (C.M.A. 1989) (emphasis added).[14]

In *Hubbard* a third party transferred stolen property to the appellant four months after he initially stole it. The court determined "[s]uch factual circumstances do not reasonably suggest that asportation [of the stolen property] was continuing at the time the appellant received it [four months later]," and held "a belated final disposition of purloined items by the thief to a third party cannot reasonably be considered asportation." *Id.* at 205 (citations omitted).

In *United States v. Whitten*, 56 M.J. 234, 237-38 (C.A.A.F 2002), the Court of Appeals for the Armed Forces extended this reasoning to a conspiracy to commit larceny, upholding a conviction even though the appellant joined the conspiracy after his co-conspirators had initially taken the property at issue but before asportation of the stolen property was complete. "'Factually the original asportation continues as long as the perpetrator is not satisfied with the location of the goods and causes the flow of

---

[14] *See United States v. Barlow*, 470 F.2d 1245, 1253 (D.C. Cir. 1972) (providing that asportation (and thus a larceny) continues while the perpetrator is "'carrying the object away . . . until it is placed somewhere so as not to be found upon [the perpetrator], where it will be securely hidden, and where he can afterwards get it and appropriate it to himself or convert it to his own use'") (quoting *Reg v. Campbell* (1899) Rap.Jud.Quebec 8 B.R. 322, 2 Can.Crim.Cas. 357). *See also United States v. Escobar*, 7 M.J. 197, 198-99 (C.M.A. 1979) (reasoning "the taking proscription of Article 121 is violated as long as the original asportation continues") (footnote omitted).

their movement to continue relatively uninterrupted.'"  *Id*. at 237 (quoting *United States v. Escobar*, 7 M.J. 197, 199 at n.4 (C.M.A. 1979)).

Similarly, this court has applied asportation in the context of a conviction for conspiracy to commit larceny.  *See Dawson*, 50 M.J. at 599.  The appellant in *Dawson* knew a Supply Chief who routinely gave away items he obtained unlawfully from the Defense Reutilization Marketing Office.  In late 1996 the Supply Chief received a number of Vietnam-era grenade launchers.  Two or three months later, the Supply Chief invited Dawson to his residence and gave him four grenade launchers, advising him to store them for two years so as to avoid discovery.  At trial, Dawson pleaded guilty to conspiring with the Supply Chief to steal the grenade launchers.  In contrast to *Whitten*, our court concluded Dawson's plea was improvident, finding the Supply Chief completed the larceny of the grenade launchers prior to giving them to the appellant.  *Id.* at 602.

In this case, Sgt JH entered the retrograde lot, took the necessary parts and rebuilt several upper receivers long before entering into the agreement with the appellant and Cpl JS.  As many as three months later, he brought two of the upper receivers to the appellant's room for the sole purpose of convincing the appellant and Cpl JS to purchase one.

By 1 May 2013 when Sgt JH arrived at the appellant's room, the agreement to sell the receivers was a "belated final disposition of purloined items."  *Id.* (citing *United States v. Graves*, 20 M.J. 344, 346 (C.M.A. 1985).  The asportation of the upper receivers was complete, and a conspiracy to steal the receivers was a legal impossibility.

Accordingly, we conclude that the appellant's conviction for conspiracy to commit larceny cannot withstand the test for legal sufficiency and set aside that finding of guilty and dismiss that portion of the merged specification.

The appellant also asserts that Charge II is legally and factually deficient because the Government did not prove the appellant knew the upper receiver was stolen.[15]  Prior to sentencing, the military judge dismissed Charge II conditioned on final appellate review of Charge I.  Therefore, resolution of the

---

[15] This assignment of error was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

8

factual and legal sufficiency of the charge by this court under these circumstances is premature.

Applying the tests for legal and factual sufficiency to the remaining portion of the conspiracy charge as merged, we are convinced the evidence was both legally and factually sufficient. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

### Sentence Disparity

The appellant argues that his sentence is disparately severe when compared to the sentences received by several potentially related cases:  Cpl JS (the appellant's roommate), Lance Corporal (LCpl) FH, LCpl RV, and Cpl BE.  We disagree.

In addition to the appellant and LCpl JS, Sgt JH conspired with or attempted to sell stolen military property to several other Marines, among them LCpl FH.  During his testimony Sgt JH listed the other Marines who were his customers, but pointedly excluded any mention of Cpl BE or LCpl RV.[16]

Pursuant to his pleas, Sgt JH was convicted by a general court-martial of larceny, wrongful disposition of government property, drug use, and conspiracies and attempts of the same.  He was sentenced to confinement for two years, reduction to pay grade E-1, and a dishonorable discharge.  The CA approved his sentence as adjudged.

Pursuant to his pleas, Cpl JS was convicted by a special court-martial of wrongfully buying stolen property and conspiracy of the same.  He was sentenced to be confined for nine months, a fine of $4,500.00, and reduction to pay grade E-1.  Pursuant to a pretrial agreement with the CA, all confinement in excess of six months was to be suspended.

Pursuant to his pleas, LCpl FH was convicted by a special court-martial of larceny, wrongfully buying stolen property and attempting to buy stolen property.  He was sentenced to be confined for three months, forfeiture of $500.00 pay per month for three months, and reduction to pay grade E-1.  Pursuant to a pretrial agreement with the CA, all forfeitures were to be disapproved.

Pursuant to his pleas, LCpl RV was convicted by a special court-martial of wrongfully disposing of military property by giving or selling it to Sgt JH, LCpl FH and a third Marine.  He was

---

[16] Record at 152.

sentenced to be confined for six months, a fine of $500.00, reduction to pay grade E-1, and a bad-conduct discharge.  As a matter of clemency, the CA disapproved confinement in excess of four months, the fine, and the bad-conduct discharge.

Pursuant to his pleas, Cpl BE was convicted by a special court-martial of wrongfully attempting to buy stolen property.  He was sentenced to confinement for four months, a fine of $1,068.00, forfeiture of $750.00 pay per month for four months, and reduction to pay grade E-1.  The pretrial agreement between Cpl BE and the CA had no effect on this sentence.

The same CA convened and acted in all five courts-martial.  As the CA prepared to act in the appellant's case, he was aware of the other five cases.

The appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases.  *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985).  We are not required to engage in comparison of specific cases "'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'"  *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *Ballard*, 20 M.J. at 283) (additional citation omitted).

"Closely related" cases are those that "involve offenses that are similar in both nature and seriousness or which arise from a common scheme or design."  *United States v. Kelly,* 40 M.J. 558, 570 (N.M.C.M.R. 1994)*; see also Lacy*, 50 M.J. at 288 (citing examples of closely related cases as including co-actors in a common crime, service members involved in a common or parallel scheme, or "some other direct nexus between the service members whose sentences are sought to be compared").  The appellant bears the burden of demonstrating that any cited cases are "closely related" to his case and that the sentences are "highly disparate."  If the appellant meets that burden, then the Government must show there is a rational basis for the disparity.  *Lacy*, 50 M.J. at 288*; see also United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001).  However, co-conspirators are not entitled to equal sentences.  *United States v. Durant*, 55 M.J. 258, 260 (C.A.A.F. 2001).

In conducting this analysis it is important to note that "[s]entence comparison does not require sentence equation."  *Id.* (citations omitted).  Additionally, co-conspirators are not entitled to equal sentences simply due to their status as co-conspirators.  *See id.* at 261.  Sentence disparity exists when a

10

sentence exceeds "relative uniformity" or represents an "obvious miscarriage of justice or an abuse of discretion." *United States v. Swan*, 43 M.J. 788, 793-94 (N.M.Ct.Crim.App. 1995) (citations and internal quotation marks omitted). It is with these concepts in mind that we review the appellant's sentence.

Assuming *arguendo* the appellant has demonstrated that his case is closely related to that of Cpl JS, LCpl FH, LCpl RV and Cpl BE, who each received lesser punishment, the record provides ample information for the Government to show a rational basis for any disparity.[17]

Notably, all five potential co-actors pleaded guilty at court-martial while the appellant did not. A plea of guilty is a mitigating factor in sentencing. RULE FOR COURTS-MARTIAL 1001(f)(1) MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). As a result, there is a rational basis for the sentence disparity between the appellant and Cpl JS, Cpl BE, LCpl FH and LCpl RV. In this case the awarding of the bad-conduct discharge does not represent an "obvious miscarriage of justice or an abuse of discretion." *Swan* at 793-94. Given this significant distinction, the Government has met its burden to demonstrate a rational basis for any sentence disparity.

The appellant also alleges error in that the CA failed to consider during the clemency process the sentences in the companion cases and failed to note the companion cases, other than Sgt JH's, in the CMO.

Section 0151a(5) of the Manual of the Judge Advocate General, Judge Advocate General Instruction 5800.7F (26 June 2012), directs CAs who order separate trials of companion cases to indicate such an order in the action on the record in each companion case. This court has held previously that this section is meant to provide guidance in preparation of the record of trial and does not create a substantive right for the appellant. *United States v. Bruce*, 60 M.J. 636, 642 (N.M.Ct.Crim.App. 2004). Even if the section created a substantive right, we find no prejudice under circumstances in which this CA was aware of and considered the companion cases prior to acting in the appellant's case. *United States v. Wheelus*, 49 M.J. 283, 288 (C.A.A.F. 1998).

---

[17] The Government concedes that the sentences are highly disparate. Government's Brief of 15 Jul 2015 at 7.

11

**Error in the Court-Martial Order**

A CMO must list the "findings or other disposition of each charge and specification[.]" R.C.M. 1114(c)(1). The parties concede, and we agree, that the CMO in this case inaccurately indicates the appellant was found guilty of two specifications under Charge I instead of one specification as a result of the military judge's merger for an unreasonable multiplication of charges.

We test error in CMOs under a harmless-error standard, *United States v. Crumpley*, 49 M.J. 538, 539 (N.M.Ct.Crim.App. 1998), and find these errors did not materially prejudice the appellant's substantial rights. The appellant alleges no prejudice resulting from this error, and we find none. However, the appellant is entitled to accurate court-martial records. *Id.* Accordingly, we order the necessary corrective action in our decretal paragraph.

**Sentence Reassessment**

Because of our action on the findings, we will reassess the sentence in accordance with the principles set forth in *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006), *United States v. Cook*, 48 M.J. 434, 438, (C.A.A.F. 1998), and *United States v. Sales*, 22 M.J. 305, 307-09 (C.M.A. 1986). Although a "'dramatic change in the penalty landscape' gravitates away from the ability to reassess" a sentence, *United States v. Buber*, 62 M.J. 476, 479 (C.A.A.F. 2006) (quoting *United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003)), we find no such change here.

Our decision does not alter the maximum possible punishment available, that is, the jurisdictional maximum at special court-martial. Additionally, nothing in our decision changes the factual nature of the criminal acts considered by the panel when they were determining a proper sentence. After the merger of Specifications 1 and 2 of Charge I, the members sentenced the appellant based upon his having committed a single conspiracy. Moreover, they were instructed to consider only one specification of conspiracy for sentencing purposes. Finally, the facts adduced on the affirmed charge and specification provide ample justification for the sentence the members awarded. Accordingly, we are confident the members would have imposed, and the CA would have approved, the previously adjudged sentence to reduction to pay grade E-1 and a bad-conduct discharge.

12

## Conclusion

The findings are affirmed excepting the words and figures:

"to commit offenses under the Uniform Code of Military Justice, to wit:  larceny of military property, to wit (1) rifle upper receiver, of a value of $500.00 or less, the property of the United States Government, and wrongful shipment of the said"

substituting therefore the words:

"to commit an offense under the Uniform Code of Military Justice, to wit:  wrongful shipment of a"

The sentence as approved by the CA is affirmed.  The supplemental CMO shall correctly reflect the merger of Specifications 1 and 2 of Charge I and the excepted and substituted language.

For the Court

R.H. TROIDL
Clerk of Court

13